IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAVID C. THORNTON,

        Plaintiff,

vs.                                  Case No. 05-1241-JTM

FRONTIER REFINING & MARKETING, INC.,

        Defendant.

MEMORANDUM AND ORDER

        This is an action by David Thornton against his former employer, Frontier Refining and Marketing. Thornton's claims under the Americans with Disabilities Act, 42 U.S.C. § 12202 *et seq.* ("ADA"), have been dismissed by the court. (Dkt. No. 11). His remaining claim, alleging that Frontier violated his rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), is the subject of Frontier's summary judgment motion which is now before the court.

        Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Thornton was hired in 1974 by a predecessor company to Frontier, and he worked at a refinery in El Dorado, Kansas, where crude oil was broken down into various products, including gasoline, diesel, asphalt and propane. Frontier took over operations at the refinery in November 1999.

Over the years, Thornton served in a variety of positions at the refinery. However, in December 2002, he was demoted from the position of head shift foreman to that of shift supervisor. As shift supervisor, Thornton was responsible for overseeing the overall production of the refinery. He supervised approximately 35 to 50 employees per shift.

Thornton's supervisor for the last several months of his employment at Frontier was Operations Supervisor Allan Engraf.

Work at the refinery is divided into three shifts: (1) the day shift, running from 6:30 a.m. to 2:30 p.m.; (2) the evening shift, running from 2:30 p.m. to 10:30 p.m.; and (3) the night shift, running from 10:30 p.m. to 6:30 a.m.

It is important for employees to show up for their shift on time, and to call in before their shift if they are not going to be there. This is important because, if an employee does not show up, the

person he is relieving has to remain on duty until a replacement arrives. Absenteeism and failure to call in create various problems, including interfering with the plans of the person waiting to be relieved, and creating scheduling issues. Absenteeism or the failure to call can also sometimes cause morale problems.

For these reasons, Frontier employees understand that if they are not going to be ready to start their shift on time, they need to call and let the company know. As a supervisor, Thornton knew that it was important to set a good example for his employees by reporting to work on time. He had counseled his employees about the importance of showing up for work and calling in before their shift if they could not make it.

Frontier has an FMLA policy, under which employees may request a leave of absence if they are unable to work due to, among other things, their own serious health condition. In order to request FMLA leave, an employee must submit a Family and Medical Leave of Absence form to a supervisor 30 days prior to the commencement of such leave, except where medical conditions prevent the employee from doing so.  Thornton is aware of at least one employee who has taken FMLA leave in the past.

Frontier's Equal Employment Opportunity ("EEO") policy prohibits discrimination on the basis of various criteria, including disability.

Thornton knew that he could talk with Human Relations Manager Bill Kloeblen if he had questions about the EEO policy or had other workplace issues.  Thornton never asked Kloeblen about the EEO policy, and never told Kloeblen that he believed he was discriminated against in any way.

Thornton was disciplined twice in 1997 and 1998 for performance issues, prior to the time that Frontier purchased the El Dorado refinery.  His 2002 performance review indicated a need for improvement in the areas of Interpersonal/Relationship Skills and Leadership/Supervisory Skills. The review specifically notes that "[w]hen his decisions are questioned he appears to become overly defensive," that he "has had to battle many personal adversities in the last year" and "[t]he increased levels of stress and personal health problems significantly impacted his actions and interpersonal

relationships," that when management decisions differ from his own "he will perform the directed action but makes derogetory [sic] comments about the decision," and that an issue had been raised with him "during an odor complaint about proper follow-up." (Def. Exh. I at 3-4.)

The parties dispute the reason for the 2002 demotion from head shift foreman to shift supervisor. Thornton states at one point in his deposition that with respect to the demotion "I think I was told I was missing too many days in the hospital." (Thornton dep. at 34). However, later in his deposition he explicitly agrees when asked whether he recognized at the time that "one of the reasons that the Company was demoting you was to issue a wake-up call regarding your below average, below standard performance." (*Id*. at 80). He further agreed that he recognized in 2002 that if his performance did not improve, he could suffer salary cuts or even termination. (Id. at 80-81).

Thornton called in sick to work on February 28, 2003, and again on March 1, 2003.

On March 19, 2003, Thornton missed work because he was being hospitalized in an alcohol treatment program. He did not personally give Frontier notice of his absence, but believes his brother or sister-in-law called in for him. He was discharged from the alcohol treatment program in April 2003.

When Thornton returned to work, he entered into a Return to Work Agreement with Frontier, under which he agreed to submit to random drug and alcohol testing, undergo fitness for duty evaluations, and provide any needed medical releases to Frontier. By signing the agreement, Thornton also acknowledged, "You understand that you will be expected to maintain your assigned schedule, without trades, until further notice. If exceptions are needed, they can be reviewed with your Supervisor in extenuating circumstances." (Def. Exh. M at 1.) At that time, Thornton did not request any accommodation, and did not indicate that he could not perform his job duties.

At the same time, Thornton and Frontier personnel discussed his medical bills from the alcohol treatment center, and Thornton was told that if he brought in those bills the company would be willing to discuss assisting him with the cost of his treatment. Thornton never followed up on that

4

offer, because he was going through a stressful divorce at the time. This divorce, a process that went on for four years, had caused a lot of stress in his life and led to some of his workplace issues.

On July 10, 2003, Thornton again called in sick to work. He was admitted to the hospital in July 2003.

Afer his release, Thornton told Frontier that he had been diagnosed with Post Traumatic Stress Disorder ("PTSD"), but that he was able and ready to return to work.

On August 13, 2003, Thornton did not report or call in to work. Thornton later admitted that he had slept through his shift starting time, in part because he had worked outside in the heat that day at a job unrelated to his employment with Frontier.

As a result of this no-call no-show, Thornton was suspended without pay for seven days. The disciplinary notice given to him warned Thornton that "Management remains concerned with your overall job performance and dependability" and that "immediate correction is required" in the areas of dependability, attendance and job performance. The notice also stated that "further instances of lack of dependability, unsatisfactory attendance and substandard job performance can result in further disciplinary action, up to and including termination" and that the Return to Work Agreement Thornton entered into in April 2003 was still in effect. Thornton understood that another no-call no-show could result in further discipline, up to and including termination.

Thornton again called in sick to work on August 25, 2003.

On September 30, 2003, Thornton was involved in a car accident. As a result of this accident, Thornton was charged with driving under the influence, reckless driving, leaving the scene of an accident, failure to give information and aid at the scene of an accident, and driving without a license and proof of liability insurance. Thornton eventually pled guilty to the DUI charge.

It is uncontroverted that although Thornton had been drinking alcohol before the accident, he lied to Engraf when questioned, telling Engraf that he only drank after the accident to calm his nerves.

On October 13, 2003, Thornton again did not report or call in to work. Although Thornton says he tried to call in three times, he admits that he never left a message on the company's voice mail and that he should have done so.

On October 17, 2003, Thornton was terminated by Engraf and Kloeblen.

Thornton did not at that time make any request for FMLA leave or for any accommodation. Thornton has stated that his PTSD dates back to his service in Vietnam in 1970. He was first diagnosed with PTSD in July 2003, although his diagnosis was not confirmed until October 31, 2003. Thornton never submitted a written request for FMLA leave; nor did he informally request any such leave. He was not at any time under any restrictions on his ability to perform his job functions. He never requested any accommodations to assist him in performing his job functions.

Frontier contends that Thornton's FMLA claim must fail because he never asked for FMLA leave and has not shown that the company was adverse to granting such leave. An employee may recover in an FMLA action under either of two theories. First, the employee may recover if he demonstrates that the employer has interfered, restrained, or denied the exercise of an FMLA right. *Smith v. Diffee Ford-Lincoln-Mercury*, 298 F.3d 955, 960 (10th Cir. 2002). The plaintiff under this theory must show that (1) he was entitled to FMLA leave, (2) the employer interfered with his right to take FMLA leave or to be reinstated following such leave, and (3) that there was a causal connection between the two. Alternatively, a plaintiff may recover under the FMLA by showing that his employer has retaliated or otherwise discriminated against him for opposing a practice which is unlawful under FMLA. *Id.* Under a retaliation/discrimination claim, the plaintiff establishes a prima facie case by proving that (1) he availed himself of an FMLA-protected right, (2) an employment decision adversely affected him, and (3) there is a causal connection between the two actions. *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005).

Frontier argues that Thornton's claim, whether cast as a claim of interference/entitlement or retaliation/discrimination is fatally flawed because he never requested FMLA leave or otherwise indicated a desire for unpaid leave and did not follow the company's FMLA leave request policy.

6

Second, Frontier argues that there was no causal connection between any FMLA right and Thornton's termination, since he was terminated for violating company policies.

Thornton stresses court rulings such as *Manuel v. West Lake Polymers Corp.*, 66 F.3d 758 (5th Cir. 1995) and *Neide v. Grand Court Lifestyles*, 38 F.Supp. 938, 948 (D. Kan. 1999) which have held that an employee, in order to trigger rights under FMLA, need not specifically mention FMLA in a request for leave. Thornton further stresses evidence that the company knew of his March, 2003 hospitalization, and so should have known of the potential application of FMLA.

The court finds that summary judgment is appropriate. It is uncontroverted that the two no-call no-shows in August and October of 2003 were the cause of Thornton's termination. Prior to that time, Frontier had allowed Thornton to take two leaves of absence. However, the company repeatedly informed Thornton of the need for giving notice of absences. After the August 13, 2003 no-call no-show, Frontier specifically warned Thornton that another incident could result in his termination.

Thornton's termination does not implicate the FMLA because the termination was unrelated to any request for FMLA leave, but is instead the result of the application of standard company notice of absence policies to an employee with long-standing attendance problems. *See Bones v. Honeywell Int'l.*, 366 F.3d 869, 877-78 (10th Cir. 2004). This is true even if one assumes, as Thornton argues at length, that his absences in March and July of 2003 should be considered FMLA. The fact remains that Thornton knew of the company's notice policy, and failed to comply with it on two separate occasions after the earlier absences. The FMLA does not prevent an employer from enforcing attendance polices, such as those governing giving notice, even if the underlying absence might otherwise be FMLA-qualified leave. *See Morgan v. Hill*, 108 F.3d 1319, 1325 (10th Cir. 1997).

IT IS ACCORDINGLY ORDERED this 15th day of September 2006, that the defendant's Motion for Summary Judgment (Dkt. No. 23) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE